**MANDATE**

**UNITED STATES COURT OF APPEALS**
**FOR THE**
**SECOND CIRCUIT**

1:15-cv-01190-AJN-SN

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 27th day of August, two thousand and eighteen.

Before:     José A. Cabranes,
            Gerard E. Lynch,
            Susan L. Carney,
                 *Circuit Judges.*

_____

John Olagues, Ray Wollney,

                 Plaintiffs - Appellants,

v.

Perceptive Advisors LLC, Perceptive Life Sciences Master
Fund Ltd., Joseph Edelman,

                 Defendants - Appellees,

Repros Therapeutics Inc,

                 Defendant.

_____

**JUDGMENT**
Docket No. 17-2703

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sep 18 2018

The appeal in the above captioned case from a judgment of the United States District Court for the Southern District of New York was submitted on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 09/18/2018**

17-2703-cv
Olagues v. Perceptive Advisors LLC

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————————

August Term, 2017

Submitted: June 8, 2018     Decided: August 27, 2018

Docket No. 17-2703-cv

————————

JOHN OLAGUES, RAY WOLLNEY,

*Plaintiffs-Appellants,*

— v. —

PERCEPTIVE ADVISORS LLC, PERCEPTIVE LIFE SCIENCES MASTER FUND LTD., JOSEPH EDELMAN,

*Defendants-Appellees,*

REPROS THERAPEUTICS, INC.,

*Defendant.*[*]

————————

B e f o r e :

CABRANES, LYNCH, and CARNEY, *Circuit Judges.*

————————

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

---

*Pro se* appellants John Olagues and Ray Wollney ("Plaintiffs") brought this derivative action under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), against appellees Perceptive Advisors LLC, Perceptive Life Sciences Master Fund Ltd., and Joseph Edelman (collectively, "Perceptive") seeking to require Perceptive to disgorge its profits from writing call options on shares of Repros Therapeutics, Inc. ("Repros"), that later expired. As is relevant to this appeal, Section 16(b) requires disgorgement only if Perceptive was a corporate insider of Repros when those calls expired. Under an SEC regulation, Section 16(b) liability attaches "[u]pon cancellation or expiration of an option within six months of the writing of the option." 17 C.F.R. § 240.16b-6(d). Plaintiffs ask us to read that regulation to reference not the moment of actual expiration, but, rather, the point at which the option holders became irrevocably obligated to allow the calls to expire under the rules of the Options Clearing Corporation and the Financial Industry Regulatory Authority, and, on that basis, to find that the calls effectively expired before Perceptive disposed of enough Repros shares to cease being a Repros insider. We disagree. Following the plain meaning of the regulation, we AFFIRM the judgment of the United States District Court for the Southern District of New York (Alison J. Nathan, *Judge*) dismissing the complaint.

---

John Olagues, *pro se*, River Ridge, LA; Ray Wollney, *pro se*, Fort Myers, FL, *for Plaintiffs-Appellants*.

Ralph Siciliano, Amanda Leone, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY; Frank Zarb, Proskauer Rose LLP, Washington, DC, *for Defendants-Appellees*.

---

GERARD E. LYNCH, *Circuit Judge*:

Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b), requires that certain defined "insiders" of an issuer of securities disgorge any profits derived from short-swing trades in those securities. Courts have generally read the statute, a strict-liability restriction on insider trading, precisely and mechanically according to its express terms. But litigants have increasingly called on this Court, with some success, to apply Section 16(b) in flexible ways to keep pace with an ever-changing financial system. We have been wary, however, of straying beyond the plain meaning of the statute and its accompanying regulations, particularly where doing so would precipitate a fact-intensive inquiry contrary to the statutory design. This appeal asks us to resolve a dispute over the proper interpretation of Securities and Exchange Commission ("SEC") regulations defining the application of Section 16(b) to derivative securities such as options. *See* 17 C.F.R. § 240.16b-6.

*Pro se* appellants John Olagues and Ray Wollney (jointly, "Plaintiffs") brought this derivative action under Section 16(b) against appellees Perceptive Advisors LLC, Perceptive Life Sciences Master Fund Ltd., and Joseph Edelman (jointly, "Perceptive") in the United States District Court for the Southern District

3

of New York (Alison J. Nathan, *Judge*), asking the court to order Perceptive to disgorge its profits from writing call options on shares of Repros Therapeutics, Inc. ("Repros"), that later expired.

Perceptive moved to dismiss the complaint, contending that, although Perceptive was a Repros insider when it wrote the call options, it was no longer an insider when the calls expired due to the exercise of certain put options that reduced Perceptive's ownership stake in Repros below the statutory threshold for liability. Plaintiffs, opposing the motion, argued that while the puts were exercised before the calls, by their own terms, expired, the relevant consideration under the applicable SEC regulation, 17 C.F.R. § 240.16b-6(d), was when the option holders became irrevocably committed to exercise the puts and to allow the calls to expire under the rules of the Options Clearing Corporation ("OCC") and the Financial Industry Regulatory Authority ("FINRA"). Because the FINRA Rules forbid transmission of exercise instructions after a certain time on the day before an option's expiration date, Plaintiffs argued, the puts were constructively exercised and the calls constructively expired at the same time, such that Perceptive remained an insider when the calls expired. The district court initially agreed with Plaintiffs and denied the motion, but reconsidered based on new

4

information supplied by Perceptive. It ultimately concluded that under either party's preferred approach, the puts were exercised and Perceptive was no longer a Repros insider before the calls expired. The district court therefore granted the motion and dismissed the complaint. For the reasons stated below, we affirm.

## BACKGROUND

Because a court that rules on a defendant's motion to dismiss a complaint "must accept as true all of the factual allegations contained in the complaint," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) (internal quotation marks omitted), we describe the facts as alleged in the complaint, drawing all reasonable inferences in the Plaintiffs' favor, *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015), and construing any ambiguities "in the light most favorable to upholding [Plaintiffs'] claim," *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

From January to March 2013, Perceptive entered into a series of option contracts, writing calls and buying puts on stock in Repros, a public company whose stock was traded on the NASDAQ National Market. The calls each granted an option holder the right to buy Repros shares from Perceptive at a

specified price—the "strike price." The puts each allowed Perceptive to sell

Repros shares to a third party at an agreed-upon strike price. *See Magma Power*

*Co. v. Dow Chem. Co.*, 136 F.3d 316, 321 n.2 (2d Cir. 1998). All of the options at

issue were guaranteed by the OCC, an equity derivatives clearing organization

made up of major U.S. broker-dealers, futures commission merchants, and non-

U.S. securities firms, and were governed by the rules of the OCC and FINRA, an

independent organization authorized by Congress to regulate the U.S. securities

markets. The option holders paid Perceptive $1.7 million for the call options.

When Perceptive entered those option contracts, it owned 2,862,560 shares of

Repros—over 16 percent of its outstanding stock. A beneficial owner of more

than 10 percent of the outstanding shares of a corporation is an insider under

Section 16(b). *See* 15 U.S.C. § 78p(a)(1), (b).

By Saturday, March 16, 2013, the expiration date of the calls and puts at

issue in this case, the market price of Repros stock had declined nearly by

half—from a high of around $17 per share in January 2013 to $9.42 at the market

close on Friday, March 15, 2013. That left the market price of Repros shares below

the respective strike prices of the calls and puts, which Plaintiffs allege ranged

between $10 and $12.50. The calls were therefore what is called "out of the

6

money." That is, the option holders could purchase Repros shares at a lower price on the market than they could by exercising the calls and buying the shares at the strike price. The option holders therefore logically chose not to exercise the calls and instead allowed them to expire. Perceptive profited from writing the calls by pocketing the $1.7 million it had received when it sold those options.

Correspondingly, the puts were "in the money," in that Perceptive could sell Repros shares on more favorable terms at the strike price than at the market price, and so it exercised the puts. Exercising an in-the-money option is so obviously in the option holder's interest that the OCC Rules provide for the automatic exercise of such an option "immediately prior to [its] expiration time." OCC Rule 805(d) (Nov. 2012); *see id.* 805(d)(2) ("Each Clearing Member shall be deemed to have properly and irrevocably tendered to the [OCC] . . . every option contract . . . that has an exercise price . . . above (in the case of a put) the closing price of the underlying security by $0.01 or more . . . ."). Perceptive relied on that automatic exercise mechanism for the puts. The exercise of the puts resulted in Perceptive's sale of 2,050,000 of its Repros shares, reducing its ownership stake in Repros to approximately 4 percent, well below Section 16(b)'s 10-percent

threshold. Plaintiffs allege that Perceptive made $4 million by the exercise of the puts, though they do not explain how they calculate that figure.

Plaintiffs, as Repros shareholders, filed a derivative action on behalf of Repros seeking to recover Perceptive's profits from the expiration of the calls, but not its profits from the exercise of the puts, under Section 16(b).[1] Perceptive moved to dismiss the complaint. It claimed that Section 16(b) liability could not attach unless Perceptive was the beneficial owner of more than 10 percent of outstanding Repros shares "both at the time of the . . . sale and purchase[] of the security," 15 U.S.C. § 78p(b), that the relevant purchase occurred at the moment that the calls expired under the OCC Rules at 11:59 p.m. on March 16, 2013, and that Perceptive no longer owned more than 10 percent of the outstanding Repros

_____

[1] Plaintiffs were correct not to bring a Section 16(b) claim for profits earned by the exercise of the puts. The SEC chose to exclude from Section 16(b) liability "[t]he closing of a derivative security position as a result of its exercise" and "the disposition of underlying securities at a fixed exercise price due to the exercise of a put equivalent position." 17 C.F.R. § 240.16b-6(b). Perceptive's exercise of the puts was the closing of a "derivative security"—*i.e.*, "any option . . . with an exercise or conversion privilege at a price related to an equity security," *id.* § 240.16a-1(c)—while Perceptive's sale of the Repros shares underlying the puts constituted the disposition, at a fixed price, of securities underlying an exercised "put equivalent position"—*i.e.*, "a derivative security position that increases in value as the value of the underlying equity decreases," *id.* § 240.16a-1(h). Thus, Perceptive is not required under Section 16(b) to disgorge its allegedly sizable profits from the exercise of the puts and sale of Repros shares.

shares at that time because, by then, it had exercised the puts, resulting in

Perceptive's sale of the majority of its shares.

The district court initially disagreed with Perceptive, explaining that the

relevant purchase occurred not at the moment when the calls actually expired,

but at the moment when the call holders were "'irrevocably' committed to letting

the call options expire." *Olagues v. Perceptive Advisers LLC*, No. 15-cv-1190, 2016

WL 4742310, at *4 (S.D.N.Y. Sept. 9, 2016), citing *DiLorenzo v. Murphy*, 443 F.3d

224, 229 (2d Cir. 2006). Under the FINRA Rules, option exercise instructions were

due by 5:30 p.m. on March 15, 2013. *See* FINRA Rule 2360(b)(23)(A)(iii) (eff. Dec.

5, 2011). The district court concluded that the call holders were bound either to

exercise the calls or to let them expire by that FINRA-imposed deadline, marking

the time at which the calls constructively expired and the puts were

constructively exercised. Because, on that analysis, the calls expired and puts

were exercised simultaneously for purposes of Section 16(b), the court denied the

motion, without prejudice to Perceptive's filing another motion to dismiss with

briefing on the effect of such simultaneous exercise and expiration.

Perceptive moved for reconsideration and renewed its motion to dismiss.

In support of its motions, Perceptive first noted that the applicable SEC

regulation, 17 C.F.R. § 240.16b-6(d), provides that Section 16(b) liability attaches "[u]pon cancellation or expiration of an option," and argued that the district court should therefore have looked not to the moment when the exercise instructions were due under the FINRA Rules, but instead to the moment the calls actually expired and the puts were actually exercised. Perceptive also called the district court's attention to other OCC and FINRA rules that, in its view, allowed option holders to submit exercise instructions up until the moment of expiration. The district court agreed with Perceptive's contention, and concluded that whether it looked to the moment of actual expiration and exercise, as Perceptive argued was appropriate, or to the point of irrevocable commitment by the option holders to those outcomes, as Plaintiffs suggested, Section 16(b) liability could not attach until the calls expired at 11:59 p.m. on March 16, 2013, and the puts were automatically exercised "immediately prior" to that time. *Olagues v. Perceptive Advisers LLC*, No. 15-cv-1190, 2017 WL 3605511, at *6 (S.D.N.Y. July 26, 2017), quoting OCC Rule 805(d). The district court therefore entered judgment dismissing the complaint, from which Plaintiffs now appeal.

## DISCUSSION

We review *de novo* the district court's order of dismissal. *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 868–69 (2d Cir. 2014).

Section 16(b) of the Exchange Act is an insider-trading statute that requires statutorily defined corporate insiders to disgorge short-swing profits obtained by trading in the securities of the corporation. *See* 15 U.S.C. § 78p(b); *Credit Suisse Secs. (USA) LLC v. Simmonds*, 566 U.S. 221, 223 (2012). It provides that,

> [f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the [corporation], any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such [corporation] . . . or a security-based swap agreement involving any such equity security within any period of less than six months . . . shall inure to and be recoverable by the [corporation] . . . .

15 U.S.C. § 78p(b). The statute defines a beneficial owner as one who owns more than 10 percent of the corporation's equity securities "both at the time of the purchase and sale." 15 U.S.C. § 78p(b); *see id.* § 78p(a)(1). Thus, to state a claim under the statute, a plaintiff must plausibly allege that "there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's

11

securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

The statute is strong medicine for the ill Congress sought to address. It "imposes a form of strict liability . . . even if [the insider] did not trade on inside information or intend to profit on the basis of such information." *Gollust v. Mendell*, 501 U.S. 115, 122 (1991). Courts have therefore "been reluctant to exceed a literal, 'mechanical' application of the statutory text in determining who may be subject to liability," *id.*, recognizing that "Congress did not reach every transaction in which an investor actually relies on inside information," *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972), and required disgorgement from some insiders who did not profit utilize inside information. The strict liability remedy should be employed cautiously to avoid unfair application.

That is not to say that we are never to look beyond the statutory text. Both courts and the SEC have recognized that "the growing complexities of financial transactions have generated numerous issues of statutory interpretation that admit of no clear resolution." *Roth*, 740 F.3d at 869. To provide guidance in applying the statute, the SEC adopted regulations to implement Section 16(b)

with respect to derivative securities. The agency stated the goal of those

regulations as follows:

> Given the uncertainty surrounding the application of
> section 16 to derivative securities under the former rules
> and existing case law, the Commission is adopting a
> comprehensive regulatory framework, in order to effect
> the purposes of section 16 and to address the
> proliferation of derivative securities and the popularity
> of exchange-traded options.

*See* S.E.C., Ownership Reports and Trading by Officers, Directors and Principal

Security Holders, 56 Fed. Reg. 7242-01, 7248 (Feb. 21, 1991) (hereinafter "Final

Rule Adoption"). Thus, although Section 16(b) speaks only of "any equity

security . . . or a security-based swap agreement involving any such equity

security," 15 U.S.C. § 78p(b), SEC regulations detail how derivative

securities—including calls and puts—may also trigger liability under the statute.

*See* 17 C.F.R. §§ 240.16a-1(c), 240.16b-6. The regulations are premised on the

recognition that "holding derivative securities is functionally equivalent to

holding the underlying equity securities for purposes of section 16, since the

value of the derivative securities is a function of or related to the value of the

underlying equity security." Final Rule Adoption, 56 Fed. Reg. at 7248.

13

The regulations define a number of option transactions as Section 16(b) "sales" and "purchases." *See* 17 C.F.R. § 240.16b-6(a), (d). Most relevant for this case, they provide that, "[u]pon cancellation or expiration of an option within six months of the writing of the option, any profit derived from writing the option shall be recoverable under section 16(b)." *Id.* § 240.16b-6(d). That provision is "designed to prevent a scheme whereby an insider with inside information favorable to the issuer writes a put option"—or, as alleged here, an insider with inside information *unfavorable* to the issuer writes a call option—"and receives a premium for doing so, knowing, by virtue of his inside information, that the option will not be exercised within six months." *Gwozdzinsky*, 156 F.3d at 309; *see Roth*, 740 F.3d at 870–71.

The elements of a Section 16(b) claim are unchanged whether the instruments at issue are standard equity securities or more complex derivative securities. *Gwozdzinsky*, 156 F.3d at 308. There must be (1) a sale and (2) corresponding purchase of derivatives connected to Repros's equity securities (3) by a Repros insider (4) within a six-month period. Plaintiffs claim that, under the SEC regulations, Perceptive's writing of call options on Repros shares between January and March 2013 constituted Section 16(b) "sales," while the expiration of

14

those call options less than six months later, in March 2013, constituted Section 16(b) "purchases." All the while, Plaintiffs say, Perceptive was a Repros insider because it owned more than 10 percent of the company's outstanding stock. Though Perceptive disputes only that it was a Repros insider at the time of the Section 16(b) "purchases," we briefly explain how the undisputed elements of Plaintiffs' claim are met.

First, Perceptive's writing of the call options constituted "sales" under Section 16(b). Though Section 240.16b-6(d) of the Regulations "does not identify the events it lists—the writing and the expiration of the option—as either purchases or sales," *Roth*, 740 F.3d at 871, another provision provides that "the establishment of . . . a put equivalent position . . . shall be deemed a sale of the underlying securities," 17 C.F.R. § 240.16b-6(a). A "put equivalent position" is "a derivative security position that increases in value as the value of the underlying equity decreases." *Id.* § 240.16a-1(h).

That describes the call options that Perceptive wrote. As we have previously explained, "when the market price of the security is above but dropping close to the strike price [of the call option], the cost to the [call] writer of selling [the security to the call holder] at the strike price decreases," and "[i]f the

market price falls below the strike price, the option holder will not exercise it, and the writer will profit on the premium." *Roth*, 740 F.3d at 871. This case provides a perfect illustration of the principle: Perceptive sold the call options on Repros shares for $1.7 million. As the market price of those shares declined toward the strike price, the potential loss to Perceptive from selling Repros shares at the strike price, rather than at the market price, decreased in tandem. When the market price of the shares ultimately fell below the strike price, there was no value to the call holders in buying the shares at the strike price, and so they allowed the calls to expire, leaving Perceptive with a pure profit of $1.7 million on the calls.

Second, the expiration of the call options constituted corresponding Section 16(b) "purchases." That, too, is clear from our precedent. In *Roth*, we gave particular weight to the SEC's statement in proposing the regulations extending Section 16(b) to derivative securities that, "in the case of an expiration of a short option position,[2] the expiration would be treated as the purchase of the option because there is short-swing profit potential in such a case." *Id.* at 871, quoting

---

[2] "A party establishes a short call option position by writing a call option." *Allaire Corp. v. Okumus*, 433 F.3d 248, 251 (2d Cir. 2006).

16

S.E.C., Ownership Reports and Trading by Officers, Directors and Principal Stockholders, 53 Fed. Reg. 49997-02, 50008 (Dec. 13, 1988). That makes sense because, as explained above, "[w]hen an insider sells a call option, and that same option expires unexercised less than six months later, the writer's opportunity to profit on the underlying stock is realized." *Id.* at 872.

Third, Perceptive wrote the calls between January and March 2013, and all the relevant calls expired in March 2013; thus, the "sales" and "purchases" easily fall into the statute's six-month window.

With those elements established, then, we must determine whether Perceptive was a Repros insider as the beneficial owner of more than 10 percent of Repros's outstanding stock "both at the time of the purchase[s] and sale[s]." 15 U.S.C. § 78p(b). The parties agree that Perceptive was a Repros insider at the time of the "sales," when it wrote the calls, as it owned approximately 16 percent of Repros's outstanding stock until it exercised the puts and disposed of over two million shares. But Perceptive argues that it was no longer a Repros insider at the time of the "purchases" because it exercised the puts, dropping its stake in Repros below the 10-percent threshold, before the calls expired. That question of

17

timing, to which we devote the rest of this opinion, turns on the meaning of the words "[u]pon cancellation or expiration" in 17 C.F.R. § 240.16b-6(d).

Because the statute "imposes liability without fault," *Foremost-McKesson, Inc. v. Provident Secs. Co.*, 423 U.S. 232, 251 (1976), "mak[ing] no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition," *Magma*, 136 F.3d at 320–21, courts (as we noted above) "have been reluctant to exceed a literal, 'mechanical' application [of Section 16(b) and its regulations] in determining who may be subject to liability," *Gollust*, 501 U.S. at 122. Such application, which the district court termed the "statutory approach," *Olagues v. Perceptive Advisers LLC*, No. 15-cv-1190, 2017 WL 3605511, at *3 (S.D.N.Y. July 26, 2017), demands "resort to the plain language." *Steel Partners II, L.P. v. Bell Indus., Inc.*, 315 F.3d 120, 123–24 (2d Cir. 2002). But, as with many statutes and regulations, "alternative constructions of the terms of [Section 16(b) and 17 C.F.R. § 240.16b-6] are possible." *Reliance Elec.*, 404 U.S. at 424. Where we cannot determine the reach of Section 16(b) and its accompanying regulations by reliance on their text alone, the Supreme Court has instructed that they "are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders,"

18

consistent with "the congressional design of predicating liability upon an 'objective measure of proof.'" *Id.* at 424–25, quoting *Smolowe v. Delendo Corp.*, 136 F.2d 231, 235 (2d Cir. 1943); *see* Final Rule Adoption, 56 Fed. Reg. at 7248 (adopting 17 C.F.R. § 240.16b-6 "in order to effect the purposes of section 16").

That interpretive progression is, of course, nothing unusual; "[e]very exercise in statutory construction must begin with the words of the text. . . . If resorting to the plain text alone fails to resolve the question, we test the competing interpretations against both the statutory structure of [the statute] and [its] legislative purpose and history." *King v. Time Warner Cable Inc.*, — F.3d —, 2018 WL 3188716, at *4 (2d Cir. June 29, 2018) (internal quotation marks omitted). What sets Section 16(b) apart, however, is its insertion of "a relatively arbitrary rule capable of easy administration," *Reliance Elec.*, 404 U.S. at 422, quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970) (internal quotation marks omitted), into the constantly evolving field of finance, "generat[ing] numerous issues of statutory interpretation that admit no clear resolution," *Roth*, 740 F.3d at 869.

Significant here, Section 16(b)'s "definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a

19

sale or a purchase." *Kern Cty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593–94 (1973). To "implement congressional objectives without extending the reach of the statute beyond its intended limits," the Supreme Court in *Kern County* excluded from liability "borderline transactions" that do not "serve as a vehicle for the evil which Congress sought to prevent." *Id.* at 594–95; *see Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 218 (2d Cir. 2012).

But such a resort to judicial implementation of the purpose of Section 16(b) is appropriate only where the text of the statute or regulations is ambiguous. Uncertainty as to the meaning of specific words in Section 16(b) or 17 C.F.R. § 240.16b-6 does not authorize courts to look beyond their plain meaning in all cases. And when we construe Section 16(b) in relation to complex transactions and derivative securities not specifically addressed by the statutory text, we have the benefit of regulatory guidance from the SEC, the agency entrusted by Congress with the implementation of the securities laws. Acting within the authority expressly granted to it by Congress,[3] and relying on its expertise with

---

[3] For example, 15 U.S.C. § 78c(a)(11) defines "equity security" to include "any stock or similar security . . . or any other security which the [SEC] shall deem to be of similar nature and consider necessary or appropriate . . . to treat as an equity security." And, in Section 16(b) itself, Congress excluded from liability "any transaction . . . which the [SEC] by rules and regulations may exempt as not

respect to securities markets, the SEC has adopted regulations addressing many such transactions and securities, including those at issue here. Plaintiffs do not contend that those regulations are unreasonable or invalid interpretations of the statutory mandate. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984); *cf. Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 249 (2d Cir. 2008). Accordingly, the text of 17 C.F.R. § 240.16b-6 provides the clearest guidance as to the application of Section 16(b) to the options in this case.

Indeed, this Court has strictly limited the *Kern County* exception to its facts, excluding from liability under Section 16(b) only the "atypical insider" who "lacked access to inside information" and whose "shares were sold involuntarily." *At Home Corp. v. Cox Commc'ns, Inc.*, 446 F.3d 403, 408 (2d Cir. 2006). And although we have occasionally looked to the congressional and agency purpose to interpret various terms in 17 C.F.R. § 240.16b-6, *see, e.g.*, *Roth*, 740 F.3d at 872 (interpreting "purchase" in § 240.16b-6(d)); *Allaire Corp. v. Okumus*, 433 F.3d 248, 251–52 (2d Cir. 2006) (interpreting "establishment" and "liquidation" in § 240.16b-6(a)), we still begin with the text of the regulation and go no further unless an ambiguity in the language so requires.

_____

comprehended within the purpose of this subsection." *Id.* § 78p(b).

21

And so we turn to the question of when liability attaches under Section 240.16b-6(d)—at the moment of actual expiration or the moment when the option holder is irrevocably committed to let the option expire. We agree with Perceptive that the language of the regulation gives us the answer: an insider must disgorge its profits "*[u]pon cancellation or expiration* of an option." 17 C.F.R. § 240.16b-6(d) (emphasis added). Though "upon" has many meanings and usages, the only available meanings in this context is "on the occasion of" or "at the time of."[4] The OCC By-Laws in effect at the time define, to the minute, the "time of" the expiration of the calls—11:59 p.m. on March 16, 2013.[5] *See* OCC By-Laws, art. I, § E., ¶¶ 20, 22–23 (Nov. 2012). The OCC Rules direct that the puts

---

[4] *See* Upon, prep., *Webster's Third New Int'l Dictionary* 2518 (1993) (definition 10b); *see also* Upon, prep., *Oxford English Dictionary* 301 (2d ed. 1991) (definitions 6a, "[d]enoting the day of an occurrence, regarded as a unit of time," and 7a, "[o]n the occasion of").

[5] The meaning of "expiration" is plain. However, because options have different expiration terms, determining the actual time of expiration in any given case requires turning to the contract between the parties. Given that the relevant options contracts were governed by the OCC, we turn to the OCC By-Laws to provide the time of expiration here. *See United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) ("The plain meaning does not turn solely on dictionary definitions of the statute's component words, but is also determined by the specific context in which that language is used, and the broader context of the statute as a whole.") (internal quotations omitted).

were automatically exercised "immediately prior" to the moment of expiration.

OCC Rule 805(d)(2). Thus, the puts were exercised (and Perceptive's shares

subject to the puts were divested) "immediately prior" to their expiration at 11:59

p.m. on March 16, 2013, which was, in turn, the moment at which the calls

expired. Accordingly, Perceptive was no longer a Repros insider when the calls

expired, and bears no Section 16(b) liability here.[6]

_____

[6] Plaintiffs argue that, even if we look only to the plain meaning of the regulation, Perceptive remained the beneficial owner of the Repros shares after the puts were exercised on March 16, 2013, because Perceptive retained voting or investing power over the shares until March 20, 2013. *See* 17 C.F.R. §§ 240.13d-3(a), 240.16a-1(a)(1). That is incorrect.

Section 16(b) applies to "such beneficial owner," 15 U.S.C. § 78p(b), which refers back to the "beneficial owner of more than 10 percent of any class of any equity security" in Section 16(a), *id.* § 78p(a). The SEC issued a relevant interpretive release, to which we defer unless "plainly erroneous or inconsistent with the regulation[]," *Roth*, 740 F.3d at 871, quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997), explaining that, for purposes of Section 16(a), and therefore Section 16(b), "an insider . . . divests himself of such beneficial ownership at the time he makes a firm commitment for its sale." S.E.C., Interpretive Release on Rules Applicable to Insider Reporting and Trading, 46 Fed. Reg. 48147, 48151 (Oct. 1, 1981). Because Perceptive's exercise of the puts committed it to sell the Repros shares underlying those options, Perceptive divested itself of beneficial ownership of those shares and fell below Section 16(b)'s 10-percent threshold at the moment of exercise.

We recognize that the standard for determining when beneficial ownership ends in some ways resembles Plaintiffs' proposed irrevocable-commitment approach to determining when Section 16(b) liability attaches to expiring calls. But as we explain *infra*, courts looking to the purpose of Section 16(b) and its regulations, rather than the plain meaning, will not always adopt the irrevocable-

23

The district court, in ruling upon Perceptive's second motion to dismiss, did not decide whether it was appropriate to look beyond the plain meaning of Section 240.16b-6(d) in this instance. Instead, it found that FINRA and OCC rules dictated that option holders may exercise options until the moment of actual expiration, and thus the moment of irrevocable commitment merges with the moment of actual expiration and exercise because the option holder may change her mind until she disposes of the option. If the call holders were obligated to let the calls expire only at 11:59 p.m. on March 16, 2013, and the puts were automatically and irrevocably exercised just before that time, the puts were exercised before the calls expired, constructively or otherwise.

We have our doubts as to whether the district court successfully located the respective moments at which the option holders were irrevocably bound to exercise the puts or let the calls expire under the OCC and FINRA rules. But even

---

commitment approach. Rather, they are to apply the approach that best advances, in that particular instance, the "congressional purpose of curbing short-swing speculation by corporate insiders," as guided by the "congressional design of predicating liability upon an 'objective measure of proof.'" *Reliance Elec.*, 404 U.S. at 424–25, quoting *Smolowe*, 136 F.2d at 235. Just as the irrevocable-commitment approach provides a simple mechanism for determining when beneficial ownership ends, a plain reading of Section 240.16b-6(d) offers the most straightforward path to determining when options are exercised or expire.

if we looked beyond the language of the statute and regulations to their

purposes, such an analysis does not necessarily recommend Plaintiffs'

irrevocable-commitment theory. We look beyond the plain text to advance the

"congressional purpose of curbing short-swing speculation by corporate

insiders," as guided by the "congressional design of predicating liability upon an

'objective measure of proof.'" *Reliance Elec.*, 404 U.S. at 424–25, quoting *Smolowe*,

136 F.2d at 235. Those policies—curbing insider trading and relying on objective,

mechanical standards—do not always pull in the same direction. And "serving

the congressional purpose does not require resolving every ambiguity in favor of

liability under § 16(b)." *Foremost-McKesson*, 423 U.S. at 252. For example, the

Supreme Court has noted that Section 16(b) "clearly contemplates that a statutory

insider might sell enough shares to bring his holdings below 10%, and later—but

still within six months—sell additional shares free from liability under the

statute." *Reliance Elec.*, 404 U.S. at 423.

  If the Supreme Court has recognized and tolerated such an obvious way

for corporate insiders to work around Section 16(b) in the context of equities—the

financial instruments specifically addressed in the statute—we see no reason,

based on congressional intent or otherwise, to sanction investors for doing the

exact same thing with options, which are only covered by Section 16(b) due to regulatory intervention. It is also telling that, by regulation, the exercise of the far more lucrative put options does not trigger Section 16(b) liability, even though it was that event that was necessary for Perceptive to avoid liability for the expiration of the call options. *See supra* n.1; *see also* Final Rule Adoption, 56 Fed. Reg. at 7249 ("Since the exercise [of a derivative security] represents neither the acquisition nor the disposition of a right affording the opportunity to profit, it should not be an event that is matched against another transaction in the equity securities for purposes of section 16(b) short-swing profit recovery."). It is difficult to see how attaching liability to the latter, but not the former, would advance the purpose of Section 16(b). And as demonstrated by the district court's difficulty in determining the moment that the option holders were irrevocably committed to exercising the puts and letting the calls expire under the rules of the OCC and FINRA, as compared with the ease of identifying the actual moment when the puts were exercised and the calls expired under those rules, a plain-meaning analysis is far better aligned with the congressional design of adhering to an objective, mechanical rule. In this context, at least, Plaintiffs' preferred

26

approach simply does not offer the "relatively automatic operation" of Section 16(b). *Blau v. Lamb*, 363 F.2d 507, 516 (2d Cir. 1966).

We therefore conclude that whether we look to the text of Section 240.16b-6(d) or the congressional purpose of Section 16(b) in this case, our safest lodestar is the plain meaning of the regulation. Because we understand the rule's statement that liability attaches "upon the cancellation or expiration of [the] option" to mean that there could be liability only if Perceptive owned more than 10 percent of Repros shares at the moment when the calls actually expired, and because the puts were exercised—resulting in Perceptive's sale of most of its Repros shares—prior to the expiration of the calls, the expiration of the calls did not trigger liability.

## CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court.